**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

YVONE RICE AND RALPH RICE,     :
individually and on behalf of E.R.,   :
a minor,                      :    Case No.: 5:20-cv-2199
                                :
        Plaintiffs,          :
                                :
      v.                     :
                                :
BIO-MED SCIENCE ACADEMY STEM  :
SCHOOL and EDUCATIONAL SERVICE :
CENTER OF CUYAHOGA COUNTY    :
GOVERNING BOARD, a/k/a EDUCA-  :
TIONAL SERVICE CENTER OF       :
NORTHEAST OHIO,            :    JURY TRIAL DEMANDED
                                :
        Defendants.       :

---

## COMPLAINT

---

       Plaintiffs Yvone Rice ("Mrs. Rice") and Ralph Rice ("Mr. Rice"), individually and on behalf of E.R., a minor  (collectively, hereafter, "Plaintiffs"), file this complaint and demand for jury trial against Defendant Bio-Med Science Academy STEM School ("Bio-Med") and Defendant Educational Service Center of Cuyahoga County Governing Board, a/k/a Educational Service Center of Northeast Ohio ("ESC NEO") (collectively, hereafter, "Defendants") and allege the following:

      1. Plaintiffs bring this action against Defendants for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and its implementing regulations, 28 C.F.R. Part 35, by failing to reasonably modify their policies, practices, or procedures to assist Bio-Med's student, E.R., in handling his service dog, Greta, at school. 42 U.S.C. § 12132; 28 C.F.R. §

35.136(a).

2.  Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). In so doing, Congress found that the forms of discrimination encountered by individuals with disabilities include "the discriminatory effects of overprotective rules and policies" and the "failure to make modifications to existing facilities and practices." *Id*. § 12101(a)(5). The ADA's mandate that a public entity, such as a public school, must modify its policies, practices, and procedures to permit the use of a service animal by a student with a disability furthers the ADA's overarching goals of ensuring equal opportunity, full participation, and independence for individuals with disabilities. *See id.* § 12101(a)(7); 28 C.F.R. § 35.136(a). "In the school (K-12) context and in similar settings, the school or similar entity may need to provide some assistance to enable a particular student to handle his or her service animal."  U.S. Dep't of Justice Frequently Asked Questions at p. 6, Question 27 (2015).

## JURISDICTION and VENUE

3.  This Court has jurisdiction over this action under Title II of the ADA, 42 U.S.C. § 12133, and 28 U.S.C. §§ 1331 because it involves claims arising under federal law.

4.  The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 12133.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because: (1) Defendants are located and operate in the Northern District of Ohio, and (2) a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Ohio. 28 U.S.C. § 1391.

## PARTIES

6.  Plaintiffs Mr. and Mrs. Rice are husband and wife and residents of Portage County, Ohio.

They are the parents of E.R., a minor, who lives in the family's home in Portage County.

7.   Defendant Bio-Med is a public school that is certified as a STEM school by the State of Ohio.

8.   Defendant ESC NEO is a publicly funded political subdivision and school district under Ohio law that provides services to other Ohio public schools, including the hiring of Bio-Med's staff and the leasing of Bio-Med's personnel to Bio-Med as a purchased service.

9.   The Defendants jointly employ Bio-Med's personnel.

10. Defendants, along with their respective departments, agencies, and other instrumentalities, are "public entities" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104, and are therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35.

11. Defendants receive federal funding, and are therefore subject to Section 504 of the Rehabilitation Act.

### FACTS

12. E.R. began attending Bio-Med as a sixth-grade student.

13. E.R. is enrolled as a ninth-grade student for the 2020-21 school year at Bio-Med.

14. When E.R. was about one year old, his parents noticed certain developmental delays, including that he stopped talking.  His pediatrician referred E.R. to Akron Children's Hospital, where Dr. John Duby, then head of Pediatric Neurology at the hospital, conducted a series of tests that resulted in a diagnosis of autism and apraxia.

15. From that point on, E.R.'s parents have taken care to provide speech therapy and other interventions to assist his development.

16. By age four, E.R. again began to learn to speak, and he was no longer diagnosed with

apraxia.  At about this time, however, he was given the additional diagnosis of attention deficit hyperactivity disorder (ADHD).

17. E.R. continues to progress and is able, with medication, to attend school for a full day. Developmentally, according to his treating physicians, E.R. is approximately two years behind his peers socially and emotionally.

18. E.R. is currently diagnosed with autism spectrum disorder, ADHD, disturbance in sleep behavior, epistaxis, migraines, and situational anxiety.

19. Autism inhibits E.R.'s ability to perceive danger, and causes meltdowns, elopement (wandering), and stimming (repetitive body movements or repetitive movement of objects, such as flapping arms over and over).

20. E.R.'s impairments substantially limit the operation of major bodily functions, including his brain function and neurological system, and his ability to engage in the major life activities of caring for himself, walking, speaking, learning, thinking, and communicating.

21. E.R. has one or more disabilities within the meaning of the ADA. 42 U.S.C. § 12102; 28 C.F.R. § 35.104.

22. E.R., a student enrolled with Bio-Med, is a qualified individual with a disability. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

23. In April of 2016, E.R.'s treating physician, Margo Dell, a nurse practitioner of developmental pediatrics at the NeuroDevelopmental Science Center at Akron Children's Hospital, prescribed E.R. a service dog for his autism diagnosis.  (Copy of prescription attached as Exhibit A).

24. Plaintiffs then applied in May of 2016 to 4 Paws for Ability in Xenia, Ohio, for a service dog trained to assist a child with autism like E.R.

25. At the time Plaintiffs applied for a service dog to assist E.R., he was in the twentieth percentile in terms of his physical development, weighing only 50 or 60 pounds.  His low weight was due to one of his medications, which suppressed his appetite.

26. E.R. no longer takes the medication that suppressed his appetite.  He now weighs more than 160 pounds, is more than 5 feet 4 inches tall, and he is physically strong enough to walk wherever he needs to go and handle Greta.

27. It costs 4 Paws for Ability approximately $40,000 to train a service dog.  4 Paws for Ability requires the recipients of the service dog to contribute, either from their own funds or from donations made by others, $15,000.  4 Paws for Ability raises the rest of the cost through its own fundraising efforts.

28. In June of 2016, 4 Paws for Ability accepted Plaintiffs' service dog application and entered into an agreement with Plaintiffs to provide a service dog trained to assist E.R. as a child with autism.

29. Pursuant to their agreement with 4 Paws for Ability, Plaintiffs were required to raise $15,000 toward the cost of the service dog and its training.

30. By March of 2017, Plaintiffs had raised and paid their full share of the cost of the service dog and its training.  At that point, they went onto 4 Paws for Ability's waiting list, until a match was ready.

31. Plaintiffs themselves had paid $10,275 toward the service dog costs.  The remainder had been raised through Plaintiffs' fundraising efforts, which included a pasta dinner, a press release that Plaintiffs, their friends and their family circulated on social media, and other efforts to raise funds for the service dog fee.

32. In late 2018, 4 Paws for Ability notified Plaintiffs that they had identified a dog that they

were training as a potential match for E.R.  4 Paws for Ability then scheduled Plaintiffs to attend its two week Placement Training program at its Xenia, Ohio, facility in April of 2019.

33. In early 2019, 4 Paws for Ability notified Plaintiffs that they were to be matched with Greta, a service dog that 4 Paws for Ability had trained to perform tasks for the benefit of E.R. that are directly related to his autism disability.

34. Prior to taking Greta into their home, in April 2019 Plaintiffs spent two weeks completing 4 Paws for Ability Placement Training sessions at its site in Xenia, Ohio.

35. As part of the Placement Training program conducted by 4 Paws for Ability, 4 Paws for Ability provided Plaintiffs a document entitled "School Policies and Expectations: Service Dog Facilitator" (hereafter "School Policies and Expectations").

36. The 4 Paws for Ability "School Policies and Expectations" document advised Plaintiffs of the following best practices to ensure a successful experience for E.R.:

> Due to the age and/or ability of the individual, there is a need for assistance from a one on one aid[e] or designated individual to facilitate the use of a service dog.  The Department of Justice who oversees the enforcement of the ADA believes it is a reasonable accommodation under the current ADA Civil Rights Law for the school to provide this aide to assist the child in handling their dog.  4 Paws for Ability has a set of policies and expectations that we have found necessary for a successful experience.
> 1. The Service Dog Facilitator must be a one on one aid[e] or designated individual that is specifically paired with just the individual with special needs who has the service dog.
> 2. The Service Dog Facilitator must receive two weeks of training, or the equivalent, to work with the individual with special needs and the service dog.
> 3. Instruction for the two week training may be completed by the trained legal guardian of the child with the service dog, a previously trained aid[e], or attendance at a 4 Paws for Ability Placement Training class at our facility in Xenia, OH.

37. With regard to E.R.'s autism, Greta is trained to sit down to prevent elopement, to apply deep pressure to prevent or limit meltdowns, and to disrupt stimming.

38. Greta is trained to go through the school day without needing to be walked, fed, or to relieve

herself.

39. While at Bio-Med, E.R. controls Greta by holding a tether.

40. E.R. is also able to give Greta verbal commands so long as he is not in an autistic meltdown. Only very occasionally, while he is in a meltdown, E.R. may temporarily need assistance to give commands to Greta.

41. A few weeks before they attended 4 Paws Placement Training with Greta, on March 19, 2019, Mrs. Rice met with E.R.'s General Education teacher, Bio-Med's Intervention Specialist, its Student Services Coordinator, its Dean of Students and its Chief Operating Officer.  During that meeting, Mrs. Rice asked if an aide could help E.R. in handling Greta once he began to bring Greta to school.

42. Despite that Mrs. Rice was simply asking for *assistance* for E.R. in handling Greta, as 4 Paws for Ability had recommended, and not for an aide to take E.R.'s place as Greta's handler, Bio-Med refused, stating (unresponsively) that the school is not obligated to provide a handler for a service animal..

43. In its report of the March 19, 2019, meeting, Bio-Med mischaracterized Plaintiffs' request for assistance for E.R. in handling Greta as a merely optional, calming device rather than as a reasonable accommodation for the substantial limitations that E.R. experiences in his ability to engage in major life activities, stating that "the parents have elected to provide [E.R.] with a service animal as their preferred method to help [E.R.] remain calm" and that "[t]he service animal is not necessary to provide FAPE (Free Appropriate Public Education) to [E.R.]."

44. At the March 19, 2019, meeting, Bio-Med treated Plaintiffs' request for assistance for E.R. in handling Greta with deliberate indifference by mischaracterizing it as a request for an aide to replace E.R. as Greta's handler, by mischaracterizing it as an unnecessary, elective parental

preference and by denying it without gathering sufficient information from experts and other qualified individuals to meaningfully assess their request.

45. Following their March 19, 2019, meeting, Mrs. Rice provided Bio-Med with a copy of 4 Paws for Ability's "School Policies and Expectations" document, which recommends that a school assign an aide to assist students such as E.R. in handling their service dog.

46. On May 15, 2019, Mrs. Rice met with E.R.'s General Education teacher, Bio-Med's Intervention Specialist, its Student Service Coordinator, its Dean of Students and its Chief Operating Officer to discuss Plaintiffs' request that the school reasonably accommodate E.R.'s need for assistance in handling Greta.

47. At the May 15, 2019 meeting, as at the March 2019 meeting, Mrs. Rice requested that the school assign an aide to assist E.R. in handling Greta.  Again, the school refused, stating that it is not obligated to provide a handler for a service dog, despite that Plaintiffs were not requesting for the aide to be Greta's handler.

48. In its report of the May 15, 2019, meeting, Bio-Med again mischaracterized Plaintiffs' request for assistance for E.R. in handling Greta as a merely optional, calming device rather than as a reasonable accommodation for the substantial limitations that E.R. experiences in his ability to engage in major life activities, stating that "Parents have elected to provide [E.R.] with a service animal as their preferred method to assist [E.R.] to remain calm.  The service dog is not necessary to provide Free, Appropriate, and Public Education to [E.R.]"

49. At the May 15, 2019, meeting, Bio-Med treated Plaintiffs' request for assistance for E.R. in handling Greta with deliberate indifference by mischaracterizing it as a request for an aide to replace E.R. as Greta's handler, by mischaracterizing it as an unnecessary, elective parental preference and by denying it without gathering sufficient information from experts and other

8

qualified individuals to meaningfully assess their request.

50. The next day, due to Bio-Med's continuing obstructionist mischaracterizations of Plaintiffs' accommodation request and Bio-Med's refusal to agree to Plaintiffs' requested accommodation, Mrs. Rice contacted the Ohio Coalition for the Education of Children with Disabilities ("OCECD"), to see if OCECD could assist her in seeking the accommodation that she had requested.

51. Mrs. Rice emailed OCECD on May 16, 2019, indicating that Bio-Med was not being supportive of her accommodation request under the ADA.  In her email, Mrs. Rice informed OCECD that Bio-Med was maintaining that Greta is "not medically necessary," despite that Plaintiffs had to obtain a doctor's prescription as part of the 4 Paws for Ability application process.

52. OCECD agreed to advocate for Plaintiffs in seeking Bio-Med's agreement to assign an aide to assist E.R. in handling Greta at school.  OCECD assigned Lisa Lutz, an Information Specialist and Trainer for its Northeast Ohio office, to work with Plaintiffs as an advocate for the accommodation they had requested from Bio-Med.

53. Ms. Lutz has been with OCECD since July 2017.  She assists families in the northeast area of the state by providing information, training and support. She was a Parent Mentor for the Kirtland School District for 7 years, where she also assisted families. Ms. Lutz has a Master's Degree in Health Promotion/Wellness and Wilson Reading Certification.

54. On May 20, 2019, Mrs. Rice emailed Bio-Med to notify the school that Plaintiffs intended to appeal Bio-Med's denial of their accommodation request and to ask, "Who was the medical doctor that said a 1-on-1 was 'not medically necessary.'"

55. Upon information and belief, Defendants had not consulted any medical doctor in reaching their determination that Plaintiffs' accommodation request was not medically necessary.

56. By denying Plaintiffs' accommodation request on the grounds that it was not medically necessary without consulting a physician, Defendants again exhibited deliberate indifference to Plaintiffs' accommodation request.

57. Also on May 20, 2019, Mrs. Rice separately emailed Bio-Med to notify Defendants that Plaintiffs were working with an advocate, Lisa Lutz, from the Northeast office of OCECD and to request a meeting with Defendants prior to the due date for their appeal of Defendants' denial of Plaintiffs' accommodation request the day before.

58. In agreeing to serve as Plaintiffs' advocate, Ms. Lutz had informed herself of the situation and concluded that Plaintiffs were entitled to the accommodation they were seeking under the ADA.

59. On May 21, 2019, Bio-Med's Student Services Coordinator, Lydia Friedman, emailed Mrs. Rice to clarify the timeline for Plaintiffs' appeal. Ms. Friedman did not, however, respond to Plaintiffs' request for a meeting prior to filing their appeal.

60. On May 31, 2019, Mrs. Rice again emailed Bio-Med regarding Plaintiffs' request for a meeting prior to filing their appeal because Bio-Med had not responded to that request.

61. Finally, in early June 2019, Defendants notified Plaintiffs that they would meet with Plaintiffs and their OCECD advocate, Ms. Lutz, on June 11, 2019.

62. At the June 11, 2019, meeting, Plaintiffs again requested that Defendants provide E.R. with a one-on-one aide during the school day.

63. In response, Defendants indicated that they had reviewed 4 Paws for Ability's "School Policies and Expectations" document, which explained an autistic student's need for assistance in handling a service dog, and which stated that the U.S. Department of Justice "believes it is a reasonable accommodation under the current ADA Civil Rights Law for the school to provide this

aide to assist the child in handling their dog." Despite having reviewed this information, Defendants concluded that there was a lack of evidence to justify a need for E.R. to have a one-on-one aide as a support.

64. Further, Defendants again mischaracterized Plaintiffs' requested accommodation as an unnecessary, elective parental preference, stating, "Mr. and Mrs. Rice have elected to provide [E.R.] with a service animal as their preferred method to assist him to remain calm. The service animal is not necessary to provide FAPE [Free, Appropriate, and Public Education] to [E.R.]."

65. Further, in their report of the June 11, 2019, meeting, Defendants misapplied the term "covered entity" under the ADA as if it exempted Bio-Med from granting Plaintiffs' accommodation request. Defendants stated, "Bio-Med Science Academy is also considered a covered entity under ADA, and is not required to provide the student with a handler."

66. Bio-Med *is* a covered entity under ADA Title II, but that does not lessen its legal obligations with respect to Plaintiffs' request. As a covered entity, Defendants are required to provide E.R. with assistance in handling Greta, rather than being relieved of that obligation.

67. At the June 11, 2019, meeting, upon information and belief, Defendants denied Plaintiffs' accommodation request without having consulted with any physician as to whether the request was medically necessary.

68. At the June 11, 2019, meeting, Bio-Med treated Plaintiffs' request for assistance for E.R. in handling Greta with deliberate indifference by disregarding the information contained in 4 Paws for Ability's "School Policies and Expectations" document, by mischaracterizing it as an unnecessary, elective parental preference and by denying it without gathering sufficient information from experts and other qualified individuals to meaningfully assess their request.

69. Following the June 11, 2019, meeting, Bio-Med requested that Plaintiffs provide Bio-Med

with a copy of E.R.'s prescription for a service dog.

70. Plaintiffs promptly provided Bio-Med with a copy of E.R.'s prescription for a service dog (Exhibit A) along with two letters from E.R.'s teachers attesting to the need for the accommodation Plaintiffs were requesting: assistance for E.R. in handling a service dog at school.

71. One of the letters that Plaintiffs provided was from Kara Pietrowski, who had been E.R.'s School Speech Language Pathologist for two years at the school he had attended prior to Bio-Med. Ms. Pietrowski's letter states, "[E.R.] would need extensive training to understand the routine and care for a dog.  He may need assistance in the daily care of a service dog, especially at school." (Copy of April 28, 2016, letter of reference from Kara Pietrowski attached as Exhibit B).

72. The second letter that Plaintiffs provided was from Elizabeth Pahls, who had been E.R.'s Intervention Specialist for three years at the school he had attended prior to Bio-Med.  Ms. Pahls's letter states:

> I think [E.R.] would MOST definitely benefit from the use of a service dog, especially going into middle school.  [E.R.] had a strip of valcro [Velcro] on his desk in 3rd grade, that he could rub when he needed to.  I feel that he could do the same with a service dog.  Whenever he would start to feel anxious he could easily just bend down and rub his dog.  I also, feel that [t]he mere presence of his dog (a trusted companion & 100% acceptance without judgment) would help calm him and help curb any kind of anxiety he may feel, especially in middle school.  In middle school there will [be] TONS of new faces, ALL new teachers, a new building, and LOTS of transitions.  Having a serive [service] dog, will help [E.R.] feel more at ease and relaxed as he transitions into a new school.  [E.R.], along with his family have the ability to care and handle the dog.  [E.R.] is a responsible person and once he knows what he needs to do, *he will be able to handle and take care of the dog*.  (Copy of June 3, 2016, letter of reference from Elizabeth Pahls attached as Exhibit C (italics added)).

73. Despite that Plaintiffs had provided Bio-Med with a copy of E.R.'s prescription for a service dog, as requested, and two letters from his former teachers attesting to E.R.'s ability to handle a service dog with appropriate assistance, by letter dated June 25, 2019, Bio-Med's Student Services Coordinator, Lydia Friedman, responded as follows:

Thank you for sending a copy of [E.R.]'s prescription to Bio-Med Science Academy (the "School").  We have reviewed the information and acknowledge that [E.R.] will be bringing the service animal/dog to School beginning August 2019. However, pursuant to federal law, Bio-Med Science Academy is not required to provide [E.R.] with a one-on-one aide for the purpose of being a trained handler.

The Department of Justice's regulations on service animals, 28 C.F.R. 35.136, provides that "[a] public entity is not responsible for the care or supervision of a service animal.  28 C.F.R. 35.136(e).  Furthermore, 28 C.F.R. 35.136(d), states that a service animal must be under the control of its handler.  The person using the service animal must keep the service animal under the person's control.  28 C.F.R. 35.136(d).

In the Department of Justice's July 20, 2015, "Frequently Asked Questions About Service Animals and the ADA," (which is attached hereto) question 9 states as follows:

[Q:]    *Who is responsible for the care and supervision of a service animal?*
A:      *The handler is responsible for caring for and supervising the service animal, which includes toileting, feeding and grooming and veterinary care. Covered entities are not obligated to supervise or otherwise care for a service animal.*

Accordingly, Bio-Med Science Academy is a covered entity and is not responsible for the care, or supervision of the dog, rather the handler/student is responsible.

Sincerely,

Lydia Friedman
Student Services Coordinator
(Copy of June 25, 2019, letter from Lydia Freeman, Bio-Med's Student Services Coordinator, to Plaintiffs is attached as Exhibit D).

74. Once again, in Defendants' June 25, 2019, letter, despite that Plaintiffs were simply asking for *assistance* for E.R. in handling Greta, as 4 Paws for Ability had recommended, and not for an aide to take E.R.'s place as Greta's handler, Bio-Med unresponsively stated that the school is not obligated to provide a handler for a service animal.

75. In quoting selectively from the Department of Justice's Frequently Asked Questions, Defendants ignored the following passage, which confirms that *Defendants are required to do exactly what Plaintiffs have requested*: "In the school (K-12) context and in similar settings, the

13

school or similar entity may need to provide some assistance to enable a particular student to handle his or her service animal."  U.S. Dep't of Justice Frequently Asked Questions at p. 6, Question 27 (2015).

76. Further, in Defendants' June 25, 2019, letter, Defendants again misapplied the term "covered entity" under the ADA as if it exempted Bio-Med from granting Plaintiffs' accommodation request.

77. Bio-Med *is* a covered entity under ADA Title II, but that does not lessen its legal obligations with respect to Plaintiffs' request – it subjects Bio-Med to Title II's requirements. Because Bio-Med is a covered entity, Defendants are required to provide E.R. with assistance in handling Greta, rather than being relieved of that obligation.  Rather than acknowledge that obligation, Defendants deliberately ignored it, focusing instead on its position that Bio-Med was not required to replace E.R. as Greta's handler and that Bio-Med was not responsible for the care and supervision of Greta.

78. Bio-Med denied Plaintiffs' request for assistance for E.R. in handling Greta with deliberate indifference by mischaracterizing it as a request that Bio-Med assign a one-on-one aide to replace E.R. as Greta's handler and as a request that Bio-Med assume responsibility for Greta's care and supervision, neither of which Plaintiffs had requested, and by claiming that its status as a covered entity exempts it from granting Plaintiffs' request.

79. As attested by E.R.'s former teachers, Plaintiffs are fully capable of handling and taking care of a service animal, provided E.R. has some assistance at school.

80. Blocked by Bio-Med's obstructionist dealings, despite that Plaintiffs were supported in their accommodation request by an advocate from the Ohio Coalition for the Education of Children with Disabilities, Plaintiffs then retained counsel, who by letter to Bio-Med's counsel requested

14

the accommodation for E.R. pursuant to the ADA and section 504.  In her July 15, 2019, letter to

Bio-Med's counsel, Plaintiff's counsel specifically requested as follows:

> Due to [E.R.]'s disabilities, my clients are requesting that Bio-Med Science
> Academy provide a reasonable accommodation to [E.R.] by providing personnel
> (facilitator) to assist or monitor him in using his service animal.  Specifically, but
> not exclusively, this reasonable accommodation would include giving the service
> dog a command in situations where, due to conditions related to his disability,
> [E.R.] is unable to give a command.  Examples include giving a one-word
> command to the service dog to lie on top of [E.R.] if [E.R.] is in an autistic-related
> meltdown on the floor, or a command to the service dog to nuzzle [E.R.] if he is
> unable to give commands due to experiencing anxiety or uncontrollable emotional
> responses, which are manifestations of his disabilities.  (July 15, 2019, letter from
> Julie S. Mills, Esq., to Maria Limbert Markakis, Esq. (copy attached as Exhibit E)).

81. Plaintiff's counsel then clarified:

> The Rice's are not asking Bio-Med Science Academy to accommodate or care for
> the service dog, rather the school is being asked to help [E.R.], as a reasonable
> accommodation.  Specifically, the school is not being asked to engage in care or
> supervision of the service animal as a handler….  Note that … reasonable
> accommodation may include a school or similar entity providing some assistance
> to enable a particular student to use or handle his or her service animal in the school
> setting.  (Exhibit E).

82. In  response,  Bio-Med  requested  that  Plaintiffs  provide  more  detail  about  the

accommodation they were requesting.

83. Accordingly,  on  August  28,  2019,  Plaintiffs'  counsel  wrote  Bio-Med's  counsel  the

following:

> On behalf of their son [E.R.], Ralph and Yvone Rice make the following request
> for reasonable accommodation under the Americans with Disabilities Act and
> Section 504 of the Rehabilitation Act:
> The Rice's request that BioMed Science Academy enable [E.R.] to attend school
> with the assistance of his service dog by assisting and monitoring [E.R.] in using
> the dog.  This would include (but is not limited to):
>
> • assisting [E.R.] in giving commands to his service dog when he is unable to
>   give commands due to his disability. Examples include giving a command "lap"
>   to the service animal—she puts her head in [E.R.]'s lap to indicate for [E.R.] to
>   pet her—to interrupt [E.R.] becoming very agitated and to calm him down;
>   another example is that if a meltdown occurs and [E.R.] is on the floor and

15

unable to control himself, the aide would command "over" to the service animal and she would lie on top of [E.R.] with the weight of her body applying pressure and stimulating deep-pressure hugs until [E.R.] is calm;

- if [E.R.] becomes unable to control frustration and emotion and becomes overly frustrated and crying, where he is unable to issue commands to his service animal, the aide would issue a command redirect and calm him, based on [E.R.]'s body position, such as "nuzzle" if [E.R.] is seated or on the floor, or "touch" if [E.R.] is standing, or "paws up" depending upon other situations;
- assisting [E.R.] in tethering and untethering his service animal;
- escorting [E.R.] throughout school grounds as he is accompanied by the service animal, including assisting [E.R.] in taking his service animal on a "potty break" if necessary;
- assisting [E.R.] if he requires it when providing water to his service animal; and
- issuing and reinforcing appropriate commands in order to use the service animal to enhance [E.R.]'s communication, transition skills, social interaction, autonomy, and physical safety. [E.R.] has difficulty communicating, transitioning, interacting socially, operating independently, and as with children on the autism spectrum disorder, eloping. His service animal provides help needed due to his disabilities but, importantly, ensures [E.R.]'s safety, as elopement ("wandering") is a leading cause of death for children with autism.

The Rice's leave to the school the decision of how this assistance will be provided, however to accomplish these accommodations, a person ("aide") will need trained, along with training for a back-up to the primary aide who would be ready to step in if the primary person cannot assist [E.R.] in his right to attend school with his service animal. The Rice's remain available to train those designated on how to work with [E.R.] regarding his service animal.  (August 28, 2019, letter from Julie S. Mills, Esq., to Maria Limbert Markakis, Esq. (copy attached as Exhibit F)).

84. Bio-Med refused Plaintiffs' accommodation requests as specified by their counsel.

85. Bio-Med only agreed to permit Plaintiffs to conduct a one-hour training session for certain members of their staff, which was wholly inadequate to train Bio-Med's personnel to assist E.R. in handling Greta.

86. Defendants repeatedly disrupted the one-hour training session, interrupting Plaintiffs' attempts to conduct the training by stating that their attorney had instructed them that they did not need to do what Plaintiffs were attempting to train them to do.

87. At the conclusion of the one-hour training session that Defendants had repeatedly disrupted by refusing to cooperate with the training, it was apparent that additional training was necessary

for Bio-Med to assist E.R. as requested.

88.  Bio-Med did not, however, agree to enough additional time to complete the training.  Bio-Med agreed only that its personnel would attend one additional one-half hour training session "for the completion of the training."  (October 28, 2019 letter from Maria Limbert Markakis, Esq., to Julie S. Mills (copy attached as Exhibit G)).

89. One and one-half hours of training for Bio-Med's personnel to assist [E.R.] in handling Greta, when Plaintiffs had spent two full weeks training with Greta, is grossly insufficient.

90. Bio-Med has refused to agree to the accommodations that Plaintiffs have requested to assist E.R. in handling Greta.

91. Bio-Med's lack of assistance would put E.R. at significant risk, leaving him essentially alone during a meltdown because an untrained classroom teacher would be unable to command Greta in a manner that would assist E.R.

92. Separation of a service animal from the target member of its team is detrimental in diminishing the animal's responsiveness and effectiveness, reducing the animal's ability to respond and perform tasks for its target, and disrupting the animal-target bond that is important to the effective working connection between E.R. and his service dog. These negative effects carry over even when the individual and his or her service dog are reconnected.

93. Bio-Med's refusals caused E.R. to be separated from Greta when he attends school. Because Bio-Med's refusals prevented E.R. from attending with Greta, E.R. missed class time on numerous occasions.  If Greta had been accompanying E.R. on those occasions, Greta's presence and actions would have enabled E.R. to remain in class rather than take a walk or go out in the hall to overcome an episode of anxiety or a similar incident.

94. For example, on February 21, 2020, E.R. was separated from Greta at school.   That

morning E.R. had a meltdown triggered by his teacher's decision to sanction him with lunch detention for hitting another student with a fly swatter.

95. From the time the meltdown occurred, it took Bio-Med approximately 30 minutes to notify his mother.  Within about 15 minutes, E.R.'s mother arrived at the school with Greta.

96. When E.R.'s mother arrived at the school with Greta, E.R. and Greta immediately came together.  After Greta provided behavior disruption to E.R. and he talked to her, E.R. calmed down significantly.  About 15 minutes later E.R. informed his mother that he was ready to proceed and finish the school day.

97. Later that day, Chynna Hale, Defendant's Intervention Specialist, emailed E.R.'s mother about how well E.R. had done the rest of the day, after having been with Greta:

> Hello Mrs. Rice, I thought it would be good to update you on how [E.R.]'s rest of the day went.  After you left he went to Science.  He missed most of the class but had a good rest of his class.  He served his lunch detention with Mrs. Polen and did a very good job helping her!  They ate lunch together and he helped her with somethings around the school.  They changed the letters on the sign outside.  We observed him in his Core 5 [reading class] to make sure he was okay and he did great!  He was on task 100% of the time and was focused.  I hope this gives you some insight into the rest of his day today!  Thank you.  Chynna Hale

**FIRST CAUSE OF ACTION**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. §§ 12131-12134)**

98. The allegations set forth in Paragraphs 1 through 97 of this Complaint are hereby realleged and incorporated by reference.

99. Defendants' educational program at Bio-Med constitutes the "services, programs, or activities" of Defendants as public entities under the ADA, 42 U.S.C. § 12132.

100.     A "service animal" is currently defined by the regulations implementing the ADA as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability[.]" 28 C.P.R.§ 36.104.

101.     E.R.'s service dog Greta is a "service animal" under the ADA because she, among other things, alerts and assists E.R. while he is having a meltdown. Greta has been professionally trained to assist E.R., and has been prescribed to E.R. by his physician.

102.     E.R.'s practice of holding Greta's tether during the school day constitutes "control" by E.R. as Greta's "handler" under ADA regulations, 28 C.F.R. § 35.136(d).

103.     Greta is highly trained so that little to nothing is required to keep her under control during the school day.  Greta received extensive training that was directly related to E.R. and his disabilities, including how to respond to meltdowns, seizures, and behaviors caused by emotional dysregulation. The dog was trained to support E.R. in a structured school setting, including how to respond to environmental cues (*e.g.*, daily routines, the teacher's instructions to the class, E.R.'s behavior and actions).

104.     As part of this training, Greta was trained to perform tasks related to E.R.'s disabilities (*e.g.*, disrupting stimming and other autistic behaviors) without anyone issuing commands.

105.     Greta is trained so that if E.R. stands up, Greta will stand up; if E.R. walks, the dog walks; if E.R. stops, the dog stops; if E.R. sits down, Greta is trained to do the same.  In addition, when no task is required, Greta is trained to lie on the ground near E.R. without need for a command.

106.     Plaintiffs do not request that Defendants assist with the "care and supervision" of Greta. While at school, Greta typically does not need to eat or drink. Nor, while at school, does Greta defecate or make stains, or require cleaning or exercise. Plaintiffs attend to Greta's daily feeding, cleaning, training, and all other "care or supervision" needs, outside of school and on their own time.

107.     Plaintiffs request the accommodations set forth above so that E.R. will not be excluded from participation in or denied the benefits of the services, programs, and activities of Defendants as public entities.

108.     Unless Defendants provide the accommodations set forth above, E.R. will be subjected to discrimination relating to the services, programs, and activities of Defendants as public entities.

109.     Plaintiffs' requested accommodations as detailed above are reasonable under the specific circumstances particular to E.R.

110.     Plaintiffs are simply requesting assistance in the same way that a school would assist a non-disabled child to use the restroom, or assist a diabetic child with her insulin pump, or assist a physically disabled child employ his motorized wheelchair, or assist a visually disabled child deploy her white cane, or assist that same child with her seeing-eye dog.

111.     With Greta tethered to E.R., given Greta's training and obedience, and E.R. thereby acting as Greta's handler, Defendants are required to accommodate E.R. by occasionally assisting him as specified above.

112.     Defendants have refused to provide the reasonable accommodations requested by Plaintiffs.

113.     Defendants' obstructionist approach in their dealings with Plaintiffs was deliberately indifferent to Plaintiffs' need for the reasonable accommodation that they had requested.

114.     Defendants were deliberately indifferent to Plaintiffs' accommodation request by mischaracterizing Plaintiffs' accommodation request as a request for an aide to replace E.R. as Greta's handler; by mischaracterizing it as an unnecessary, elective parental preference; by

denying it without gathering sufficient information from experts and other qualified individuals to meaningfully assess Plaintiffs' request; by concluding that it was not medically necessary without consulting a physician; by mischaracterizing it as a request that Bio-Med assume responsibility for Greta's care and supervision, which Plaintiffs had not requested; and by claiming that Bio-Med's status as a covered entity exempts it from granting Plaintiffs' request.

115.     Accommodating Plaintiffs as requested would not fundamentally alter the educational services Bio-Med provides.

116.     Separating E.R. from his service animal during the school day has a detrimental impact on the human-animal bond and diminishes the animal's responsiveness and effectiveness outside of the school setting.

117.     Defendants' actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35, by:

    a.    Denying E.R. an equal opportunity to participate in or benefit from any aid, benefit, or service provided to other students, 28 C.F.R. § 35.130(a), (b)(1);

    b.    Providing E.R. with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to other students, 28 C.F.R. § 35.130(a), (b)(1);

    c.    Failing to reasonably modify its policies, practices, or procedures to provide assistance to E.R. in handling his service dog, 28 C.F.R. §§ 35.130(b)(7) and 35.136.

118.     E.R. and the Plaintiffs are aggrieved persons entitled to the remedies, procedures, and rights of Title II of the ADA. *See* 42 U.S.C. § 12133.

119.     As a result of Defendants' unlawful actions, E.R. has suffered discrimination, been deprived of independence, experienced pain and suffering and emotional distress, and otherwise been aggrieved.

120.     Also as a result of the Defendants' unlawful actions, Plaintiffs have incurred out-of-pocket losses, including the $10,275 they paid 4 Paws for Ability for Greta and her training costs and approximately $2,000 in travel and lodging expenses to attend Placement Training; experienced pain and suffering and emotional distress, including anxiety, frustration, humiliation, stigmatization, and lost opportunity; and otherwise been aggrieved.

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**(29 U.S.C. § 794)**

121.     Plaintiffs repeat and reallege the allegations in paragraphs one through 120 as if fully set forth herein.

122.     Defendants have provided and currently are providing educational services to the general public and receiving federal financial assistance and are, therefore, covered entities within the meaning of Section 504 of the Rehabilitation Act

123.     E.R. has disabilities in that he has autism spectrum disorder, attention deficit hyperactivity disorder (ADHD), disturbance in sleep behavior, epistaxis, migraines, and situational anxiety,  which are mental and physical impairments that substantially limit E.R.'s daily life activities.

124.     Plaintiffs requested that Bio-Med assist E.R. in handling Greta during the school day.

125.     Defendants have failed to provide E.R. with the reasonable accommodation requested by Plaintiffs.

126.     Defendants are excluding and/or discriminating against E.R. solely on the basis of his disability.

127.     Defendants' actions have violated E.R.'s right to a Free Appropriate Public Education.

128.     As a result of Defendants' actions, E.R. and Plaintiffs have suffered and will continue to suffer extreme hardship and actual and impending irreparable harm.

129.     Plaintiffs have no adequate or speedy remedy at law for Defendants' conduct described above. Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive relief against Defendants are appropriate pursuant to 42 U.S.C. § 12133.

130.     Plaintiffs are also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action.

131.     Defendants' policies, practices, and procedures, particularly the actions and omissions described above, violated the Plaintiffs' rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

132.     Defendants have acted either intentionally or in deliberate disregard for the protected rights of the Plaintiffs herein.

133.     As a proximate result of the foregoing, Plaintiffs have actual damages.

## PRAYER FOR RELIEF

A. Grant judgment in favor of Plaintiffs and declare that Defendants' actions as set forth in this Complaint violate Title II of the ADA, 42 U.S.C. §§ 12131-12134, its implementing regulation, 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act.

B. Enjoin Defendants, along with their respective departments, agencies, and other instrumentalities, and their employees and all others in concert or participation with them, from

engaging in discriminatory policies and practices against E.R., including but not limited to their discriminatory practice of refusing to assist E.R. in handling Greta; and

C. Award compensatory damages, reasonable costs and attorneys' fees, and any and all other relief that may be necessary and appropriate.

Respectfully submitted,

/s/ David T. Ball
David T. Ball (0078885)
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
614.316.8222 phone
866.498.0811 fax
dball@rosenbergball.com
*Attorneys for Plaintiffs Yvone and Ralph Rice and E.R.*

**Jury Demand:**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

/s/ David T. Ball
David T. Ball (0078885)