# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| YVONE RICE, et al., | ) | CASE NO. 5:20-cv-2199 |
| | ) | |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| GOVERNING AUTHORITY OF THE BIO- | ) | |
| MED SCIENCE ACADEMY, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Plaintiffs Yvone Rice and Ralph Rice ("plaintiffs"), individually and on behalf of their minor son, E.R., filed suit on September 29, 2020, asserting violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. and § 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, against the following entities: Governing Authority of the Bio-Med Science Academy ("Governing Authority"), Northeast Ohio Medical University ("NEOMED"), and Educational Service Center Council of Governments Governing Board ("ESC-COG") (collectively "defendants[1]").

Now before the Court are the following fully briefed dispositive motions: (1) the motion of Governing Authority for judgment on the pleadings (Doc. No. 21 (Motion), Doc. No. 24 (Opposition), Doc. No. 26 (Reply)); (2) the motion of ESC-COG for judgment on the pleadings

---

[1] Because NEOMED and ESC-COG incorporated by reference the arguments raised by Governing Authority in its motion, the Court will use the term "defendants" when discussing the arguments raised in favor of Rule 12(c) dismissal. (*See* Doc. No. 28 at 2; Doc. No. 29 at 2. All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.)

(Doc. No. 28 (Motion), Doc. No. 30 (Opposition), Doc. No. 33 (Reply)); and (3) the motion of NEOMED for judgment on the pleadings (Doc. No. 29 (Motion), Doc. No. 30 (Opposition),[2] Doc. No. 32 (Reply).) Because plaintiffs must first exhaust their administrative remedies before seeking relief in this Court, defendants' motions for judgment on the pleadings are granted and the case is dismissed without prejudice.

## I.    BACKGROUND

The Second Amended Complaint ("SAC') provides a historical narrative of what led to the issues in this case which ultimately involve the extent to which school personnel need to assist and care for a student's service dog during the school day and the nature of the training the personnel are required to undergo. While initially plaintiffs indicated that school personnel would not be required to walk, feed, or afford the service dog an opportunity to relive herself, as discussions regarding what might be needed progressed and evolved, plaintiffs requested more from school personnel. The school agreed to assume certain responsibilities for the service dog and sent school personnel to a training session with one of the plaintiffs. During the training session for school personnel, a dispute apparently arose relating to their duties, and the training was not completed. This lawsuit ensued. The background for the lawsuit, as set forth in the SAC and other Rule 12(c)-permitted materials, follows.

---

[2] According to the docket, plaintiffs filed Doc. No. 30 as an omnibus response to the dispositive motions filed by ESC-COG and NEOMED. Governing Authority has moved to strike plaintiffs' response as an unauthorized sur-reply offered in opposition to its dispositive motion. (Doc. No. 31 (Motion to Strike), Doc. No. 34 (Opposition), Doc. No. 35 (Reply).) While plaintiffs do not contest Governing Authority's representation that their omnibus response is devoted almost entirely to responding to Governing Authority's reply brief, they note that NEOMED and ESC-COG incorporated by reference Governing Authority's arguments—including, by implication, arguments raised in its reply brief—into their motions for judgment on the pleadings. In an abundance of caution, the Court has considered plaintiffs' omnibus response as part of the briefing on the Fed. R. Civ. P. 12(c) motions, and Governing Authority's motion to strike, therefore, is denied.

Plaintiffs live with their minor son, E.R., in Portage County, Ohio. (Doc. No. 16 (SAC) ¶ 6.) E.R. began attending Bio-Med Science Academy (the "Academy") as a sixth-grade student. (*Id*. ¶ 17.) Governing Authority is a public school district that operates the Academy. (*Id*. ¶ 7.) ESC-COG is a publicly funded political subdivision that, since January 1, 2020, has supplied personnel for administrative and teaching roles at the Academy. (*Id*. ¶ 8.) Prior to January 1, 2020, these employment services were provided by NEOMED. (*Id*. ¶ 9.)

E.R. has been diagnosed with autism spectrum disorder, attention deficit hyperactivity disorder ("ADHD"), disturbance in sleep behavior, epistaxis, migraines, and situational anxiety. (*Id*. ¶¶ 19, 21, 23.) "Autism inhibits E.R.'s ability to perceive danger, and causes meltdowns, elopement (wandering), and stimming (repetitive body movements or repetitive movement of objects, such as flapping arms over and over)." (*Id*. ¶ 24.) These impairments limit E.R.'s "major bodily functions, including his brain function and neurological system, and his ability to engage in major life activities of caring for himself, walking, speaking, learning, thinking, and communicating." (*Id*. ¶ 25.)

To address the limitations associated with his autism, E.R. was prescribed a service animal. (*Id*. ¶ 28.) E.R's service dog, Greta, is trained to sit down to prevent E.R. from eloping, to apply pressure to prevent or limit his meltdowns, and to disrupt stimming. (*Id*. ¶¶ 38, 42.) As initially presented to the Academy, plaintiffs indicated that Greta does not need to be walked, fed, or afforded an opportunity to relieve herself during the school day. (*Id*. ¶ 43.) Plaintiffs also indicated that E.R. is able to control Greta at school using a tether. (*Id*. ¶ 44.)  And he is able to give Greta appropriate verbal commands unless he is experiencing an autistic meltdown, during which he may temporarily require assistance. (*Id*. ¶ 45.)

3

Citing to defendants' answer, plaintiffs concede that E.R. receives special education and related services from Governing Authority through an Individualized Education Program ("IEP") administered pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. (Doc. No. 24 at 2, citing Doc. No. 19 (Answer to the SAC) ¶ 21; *see* Doc. No. 19 ¶¶ 20, 25–27, 46, 128.)

On March 19, 2019, plaintiff Yvone Rice met with Governing Authority personnel to request an aide to assist in the handling of Greta during the moments when E.R. is experiencing an autistic meltdown. (Doc. No. 16 ¶ 46.) While the SAC simply refers to this event as a "meeting," it is undisputed that the meeting was an IEP team meeting held pursuant to the IDEA. (Doc. No. 19 ¶¶ 46–47; *see* Doc. No. 16 ¶ 46.) According to plaintiffs, Governing Authority mis-characterized their request as a request for an aide to replace E.R. as Greta's handler (as opposed to someone who would assist handling Greta in certain circumstances) and denied the same as "'not necessary to provide [a] FAPE (Free Appropriate Public Education) to [E.R.].'" (Doc. No. 16 ¶ 48, quoting March 19, 2019 "report".) Though plaintiffs allege that the denial appeared simply in a "report of the March 19, 2019, meeting" (*see id*.), they do not deny that it was prepared pursuant to the written notice requirements of the IDEA. (Doc. No. 19 ¶¶ 46–48; Doc. No. 19-1 (3/19/2019 IEP Meeting Notice) at 1 ["The education team met on 3/19/2019 to review [E.R.'s] current IEP."][3]; *see generally* Doc. No. 24 at 2.)

---

[3] The Notice from the March 19, 2019 IEP meeting further provides that Mrs. Rice was in attendance, along with the IEP team, and that the team discussed E.R.'s use of a service dog and Mrs. Rice's request that an aide be provided to, among other things, assist with the handling of the service dog. (*Id*. at 1–2.) Because the SAC references the March 19, 2019 meeting and the notice (along with subsequent IEP meetings and notices), and relies on the results of that and other meetings to support the claims, the Court may consider the notices in ruling on the Rule 12(c) motion. *See Dudek v. Thomas & Thomas Attorneys & Counselors at Law, LLC*, 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010) (citations omitted).

4

Mrs. Rice attended another IEP team meeting on May 15, 2019 wherein she, once again, requested that Governing Authority "reasonably accommodate E.R.'s needs for assistance in handling Greta." (Doc. No. 16 ¶ 51; Doc. No. 19 ¶ 51.) Governing Authority denied the request, and its denial was memorialized in an IDEA-required written notice issued to plaintiffs. (Doc. No. 16 ¶§ 51-53; Doc. No. 19 ¶¶ 51–54; Doc. No. 19-2 (5/15/2019 IEP Meeting Notice) at 1 ["The education team met on 5/15/2019 to address parent questions regarding [E.R.'s] service dog."].) On May 20, 2019, Mrs. Rice emailed the Academy to notify Governing Authority that plaintiffs "intended to appeal" its "denial of their accommodation request[.]"[4] (Doc. No. 16 ¶ 59; Doc. No. 19 ¶ 59.)

Eventually, plaintiffs retained counsel who, by written correspondence dated July 15, 2019, advised Governing Authority that plaintiffs were seeking that Academy personnel be trained to give Greta "'a command in situations where, due to conditions related to his disability, [E.R.] is unable to give a command.'" (Doc. No. 16 ¶ 85, quoting Doc. No. 16-5 (Letter from Counsel) at 1.) In a follow-up letter dated August 28, 2019, counsel clarified that plaintiffs were requesting that an aide and a back-up be trained to assist E.R. when he is unable because of his disability to: (1) give appropriate commands to Greta during a meltdown to ease E.R.'s symptoms; (2) tether and untether Greta; (3) take the service animal on potty breaks; (4) escort E.R. and Greta through the school; and (5) issue and reinforce specific commands to Greta to ensure E.R.'s safety and enhance his social skills and independence. (Doc. No. 16-6 (Letter) at 1; *see* Doc. No. 16 ¶ 86.)

---

[4] Plaintiffs attended a third IEP team meeting on June 11, 2019, wherein they repeated the prior request for assistance in handling Greta. (Doc. No. 16 ¶ 67; Doc. No. 19 ¶¶ 67, 68.) Like the prior two meetings, Governing Authority denied the request and issued a notice. (Doc. No. 16 ¶ 72; Doc. No. 19 ¶¶ 70, 72; Doc. No. 19-3 (6/11/2019 IEP Meeting Notice) at 1 ["Parents requested to schedule an IEP meeting."].)

In responses to this request, Governing Authority agreed to permit plaintiffs to conduct a one-hour training session with certain Academy staff members. (Doc. No. 16 ¶ 90.) According to plaintiffs, the training session, however, proved to be "wholly inadequate to train [Academy] personnel to assist E.R. in handling Greta." (*Id*.) This was due, in part, to the fact that Governing Authority "repeatedly disrupted" the training session by interjecting that its counsel "had instructed [it] that [school personnel] did not need to do what [p]laintiffs were attempting to train them to do." (*Id*. ¶ 91.) Governing Authority subsequently agreed to an additional one-half hour training session "'for the completion of the training[.]'" (*Id*. ¶ 92, quoting Doc. No. 16-7 (Letter from Counsel) at 1.) According to plaintiffs, "[o]ne and one-half hours of training for [the] Academy's personnel to assist [E.R.] in handling Greta, when [p]laintiffs had spent two full weeks training with Greta, [was] grossly insufficient." (*Id*. ¶ 94.)

It is unclear from the pleadings whether this subsequent training session ever took place. In any event, plaintiffs allege that Governing Authority's failure to accommodate their request for adequate training of Academy personnel to assist E.R. in handling Greta has resulted in E.R. and Greta being separated during the school day. (*Id*. ¶ 98.) This separation has caused E.R. to miss out on classroom instruction during autistic meltdowns. (*Id*.; *see, e.g., id.* ¶¶ 99–101.)

Plaintiffs raise two claims against all defendants. In the first cause of action, plaintiffs allege that defendants failed to reasonably accommodate E.R.'s disability in violation of the ADA by refusing to provide adequately trained Academy staff to assist E.R. in handling Greta. (*See* Doc. No. 16 ¶¶ 112–22.) In the second cause of action, plaintiffs allege that, because of defendants' failure to reasonably accommodate E.R.'s disability, defendants are "excluding and/or discriminating against E.R. solely on the basis of his disability." (*Id*. ¶ 131; *see id.* ¶¶ 129–31.)

6

According to the second cause of action, "[d]efendants' actions have violated E.R.'s right to a Free Appropriate Public Education ['FAPE']." (*Id.* ¶ 132.)

## II.     STANDARD OF REVIEW

Defendants' motions for judgment on the pleadings are governed by Fed. R. Civ. P. 12(c). Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are closed but early enough not to delay trial. Fed. R. Civ. P. 12(c). The standard of review for a motion for judgment on the pleadings is the same as for a motion to dismiss for failure to state a claim for relief under Rule 12(b)(6). *E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir. 2001) (citing *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir. 1998)). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Id.* at 555 (citing authorities).

"'For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.'" *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir. 1973)). The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio,* 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987)). "The motion is granted when no material issue of fact exists and the party making the motion is

entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n,* 946 F.2d 1233, 1235 (6th Cir. 1991) (citation omitted). "[F]ailure to exhaust is an appropriate basis for dismissal under Rule 12(b)(6)."[5] *Hykes v. Lew*, No. 16-5509, 2017 WL 4863108, at *2 (6th Cir. Mar. 1, 2017) (citing *Steiner v. Henderson*, 354 F.3d 432, 434 (6th Cir. 2003)).

In ruling on a Rule 12(c) motion, the court considers all available pleadings, including the complaint and the answer. *See* Fed. R. Civ. P. 12(c). "The court can also consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice." *Dudek,* 702 F. Supp. 2d at832 (citations omitted).

## III. DISCUSSION

The IDEA ensures a free appropriate public education (otherwise known as a FAPE) for children with disabilities. 20 U.S.C. § 1400(d)(1)(A). "[A] FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Cmty. Schs.*, --U.S.--, 137 S. Ct. 743, 748–49, 197 L. Ed. 2d 46 (2017) (quoting 20 U.S.C. § 1401(9), (26), (29)) (additional citations omitted). As the Supreme Court has observed, "related services," as defined by the IDEA, "broadly encompass[] those supportive services that 'may be required to

---

[5] Generally, the failure to exhaust must be evident from the complaint in order to permit a Court to grant Rule 12 relief on that basis. *See Jones v. Bock*, 549 U.S. 199, 200, 215, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)). But in defending the present Rule 12(c) motions, plaintiffs concede they have not exhausted under the IDEA, choosing, instead, to argue that their claims require no exhaustion. (*See* Doc. No. 24 at 3 ["Plaintiffs never filed a complaint seeking an Administrative Review under the IDEA[.]"]; *see also id*. at 7 ["Plaintiffs' request for assistance . . . does not require prior exhaustion[.]"] (capitalization and bolding omitted).)

assist a child with a disability to benefit from special education.'" *Cedar Rapids Cmty. Sch. Dist. v. Garret F. by Charlene F*., 526 U.S. 66, 73, 119 S. Ct. 992, 143 L. Ed. 2d 154 (1999). "A service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education that Congress envisioned." *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891, 104 S. Ct. 3371, 82 L. Ed. 2d 664 (1984).

The primary vehicle for the provision of a FAPE is the IEP, a personalized plan to achieve the goal of meeting the child's educational needs crafted by the child's "IEP Team," which is comprised of a group of school officials, teachers, and parents. *Fry*, 137 S. Ct. at 749 (quoting 20 U.S.C. § 1414(d) (further citations omitted)). In addition to documenting "the child's current 'levels of academic achievement,'" and "specify[ing] 'measurable annual goals,'" the IEP also "lists the 'special education and related services' to be provided so that" the child may "'advance appropriately toward [those] goals.'" *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (II), (IV)(aa)).

The IDEA "establishes formal procedures for resolving disputes" between parents and school representatives when they "cannot agree on such issues," and requires exhaustion of those procedures before seeking judicial review. *Id*. A plaintiff seeking to enforce rights under the IDEA may also have recourse under other laws, such as the ADA and the RA. The IDEA does not "restrict or limit" a plaintiff's rights under those laws. 20 U.S.C. § 1415(l). The IDEA does require, however, that the plaintiff exhaust his administrative remedies "'before the filing of a civil action under such laws seeking relief that is also available under [the IDEA].'" *Fry*, 137 S. Ct. at 750, 754–55 (quoting 20 U.S.C. § 1415(l)).

In *Fry*, the Supreme Court explained that the exhaustion requirement applies where "the substance, or gravamen, of the plaintiff's complaint" "seek[s] relief for the denial of a FAPE[.]"

137 S. Ct. at 754–55. In addressing whether a complaint seeks relief under the IDEA, "a court should attend to the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other." *Id*. at 755. While the IDEA protects a child's educational rights, "Title II of the ADA and § 504 of the [RA] cover people with disabilities of all ages, and do so both inside and outside schools. And those statutes aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs." *Id*. at 756 (citation omitted). "In short, the IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Id*.

Thus, the Supreme Court tasked a district court with the responsibility of carefully reviewing the complaint to determine whether the substance of the allegations suggest a "focus on the adequacy of [the student's] education," even if that focus is "implicit." *Id*. at 758. And doing so, the Court recognized the inherent difficulty of the assignment. While it underscored that the plaintiff was to be treated as the "master of the claim," it cautioned that the district court, in evaluating the complaint, must "consider substance, not surface." *Id*. at 755. It, therefore, asks the district court to walk a "tightrope" between deferring to a plaintiff's decisions as to the nature and structure of her claims and ensuring that a plaintiff does not evade the exhaustion requirement of the IDEA through artful pleading. *See Doe v. Williamson Cnty. Bd. of Educ*., No. 3:20-cv-486, 2020 WL 7385262, at *7 (M.D. Tenn. Dec. 16, 2020).

The Court offered two "clues" to help courts in this analysis; the first is to answer two hypothetical questions:

First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or a library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject…. But when the answer is no, then the complaint probably does concern a FAPE.

*Fry*, 137 S. Ct. at 756 (emphasis in original). The second clue involves reviewing "the history of the proceedings." *Id*. at 757. "In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream." *Id*. "[P]rior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claims concerns a denial of FAPE, even if the complaint never explicitly uses that term." *Id*.

With respect to the first clue, the Court in *Fry* offered two contrasting examples. In the first example, a wheelchair-bound child sues his school for discrimination under Title II (without mentioning the denial of a FAPE) because the building lacked access ramps. Under this scenario, the Court observed that the answer to both hypothetical questions would be "yes" because the child could have brought essentially the same claim against another public facility, such as a library, for failing to make the facility wheelchair accessible. Similarly, an adult visitor could press essentially the same grievance against the school. *Id*. at 756. In the second example, a "student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics." *Id*. at 756–57. Under this scenario, the Court questioned whether "anyone [could] imagine" a student requiring a library to provide a similar service, or whether an adult visitor to the school would expect one-on-one instruction in mathematics. *Id*. at 757.

In the present case, defendants argue that the answer to both hypotheticals posed by the

11

Supreme Court is "no." Plaintiffs could not require a public library to provide E.R. with trained staff to assist in the handling of his service animal. Similarly, an adult visitor could not press essentially the same grievance. "That is in part because, under the ADA, '[a] public entity is not responsible for the care or supervision of a service animal.'" *A.R. v. Sch. Admin. Unit #23*, No. 15-cv-152, 2017 WL 4621587, at *6 (D. N.H. Oct. 12, 2017) (quoting 28 C.F.R. § 35.136(e) (further citation omitted)).

Plaintiffs disagree. Relying on *D.D. by and through Ingram v. Los Angeles Unified Sch. Dist.*, plaintiffs insist that the answer to the Supreme Court's hypothetical questions must be "yes." (Doc. No. 24 at 12, citing 984 F.3d 773 (2020).) Plaintiffs argue that the relevant inquiry does not turn on whether they could bring an "identical" claim in another setting or with a different individual, but rather whether it would be plausible to bring "*other* variants of the suit[.]" (Doc. No. 24 at 12, quoting *D.D.*, 984 F.3d at 788–89 ["We have no difficulty concluding that D.D. could bring a 'variant of [his] suit' if he were refused entry to a public library or a municipal theater based on the behavioral symptoms of his disability. Likewise, 'even an adult plaintiff may be entitled to receive assistance from others [within a school context] if such an accommodation is "reasonable."'"] (emphasis in *D.D.*) Applying the analysis in *D.D.*, plaintiffs posit, "[l]ikewise here, E.R. could bring a variant of his suit if he were refused entry to a public library or a municipal theater due to his need for assistance in handling Greta in certain circumstances, as could an adult within a school context." (*Id.*)

Plaintiffs' reliance on *D.D.* is misplaced for several reasons. First and foremost, the decision has been vacated and, therefore, it provides no authority, persuasive or otherwise. *See D.D. by and through Ingram v. Los Angeles Unified Sch. Dist.*, 995 F.3d 670 (9th Cir. May 6,

12

2021) (vacating panel decision and granting rehearing en banc).[6] Second, *D.D.*'s "*variant*" test, which paints any claim with extremely broad-brush strokes, is at odds with the analysis set forth in *Fry*. While it may be true that a student's potential claim against another public establishment need not be "identical," *Fry* teaches that it must be "essentially the same[.]" *Fry*, 137 S. Ct. at 756. Similarly, an adult visitor to the school must be able to assert "essentially the same grievance." *Id*. Third, plaintiffs' application of *D.D.*'s variant test still requires the Court to assume that the student visiting the library or the adult visiting the school was "refused entry" because of his disability. (*See* Doc. No. 24 at 12.) But plaintiffs do not allege that defendants *prohibited* E.R. from attending school with his service dog. Correspondence referenced in and appended to the SAC makes clear that defendants acknowledged that Greta would be attending classes with E.R. (Doc. No. 16-4 (June 25, 2019 letter) at 1 ["We … acknowledge that [E.R.] will be bringing the service animal/dog to School beginning in August 2019."].) Nor do plaintiffs deny that defendants were willing to provide E.R. with assistance in handling the service animal in certain circumstances. (*See* Doc. No. 16-7 (Oct. 28, 2019 letter) at 1 ["The School agrees" that, when E.R. is having an autistic meltdown, "trained School personnel will issue the appropriate command and . . . facilitate the dog in being able to perform the task or tasks for which the dog has been trained."].) Plaintiffs simply take issue with the nature of the assistance offered and the training of the staff that was to provide that assistance. They allege, instead, that the inadequate training *resulted* in E.R. and Greta being separated during the school day, which is not the same thing. (*See* Doc. No. 16 ¶ 98.)

Given these undisputed facts, the Court finds more instructive and persuasive the factually analogous case of *A.R.* There, the plaintiffs alleged that their minor son's school violated the ADA

---

[6] The Court acknowledges that plaintiffs' opposition brief was filed before the decision in *D.D.* was vacated.

and the RA by failing to provide a handler for their son's service dog. The court began its analysis by noting that:

> Here, . . . plaintiffs are not complaining that the [School] District is discriminating against A.R. on the basis of his disability by refusing him access when accompanied by his service dog. Instead, the crux of plaintiffs' complaint is that the District discriminates against A.R. by refusing to pay for and provide a handler for Carina [A.R.'s service dog]. So, plaintiffs are not merely asking that the District allow A.R. to be accompanied by his service dog while he is at school. *Instead, plaintiffs want the District to hire, train, and pay for a handler for Carina.*

*A.R.*, 2017 WL 4621587, at *5 (emphasis added). The district court then went on to answer both of the Supreme Court's hypothetical questions in the negative, noting that:

> the answers here suggest that the rights claimed by plaintiffs are unique to a student's efforts to obtain an appropriate public education. And, the parties' past relationship plainly suggests that plaintiffs are, in actuality, seeking relief related to A.R.'s educational entitlements, notwithstanding their denials in unison. In her March 6, 2012 letter, A.R.'s mother stated that, rather than initiating IDEA administrative proceedings to add Carina to A.R.'s IEP, the family would instead be proceeding under the ADA. While the record is unclear as to whether plaintiffs at any point did attempt to invoke the IDEA's formal procedures with respect to Carina's services, the March 6, 2012, letter lends some support to a finding that the gravamen of plaintiffs' suit concerns the denial of a FAPE.

*Id.* at *6.

While plaintiffs are not demanding that E.R. be replaced as Greta's handler on a full-time basis, they are requesting that school personnel be trained to step in and provide temporary handling services when E.R. is unable to do so. There can be no question that a student could not require this of a public library any more than an adult visitor to the school could require that trained personnel be assigned to him during his visit to assist with his service animal.[7] Such a conclusion

---

[7] The Sixth Circuit panel decision in *Sophie G. by and through Kelly G. v. Wilson Cnty. Schs.*, 742 F. App'x 73 (6th Cir. 2018), cited by plaintiffs, does not suggests a contrary conclusion. There, parents alleged violations of the ADA and § 504 of the RA when a school district refused a disabled child admission to an after-school daycare program because she was not potty trained and refused to provide the child with toileting assistance. There, the court found that admission to the daycare program was not alleged by plaintiffs "to be necessary for Sophie to receive a FAPE, and

14

lends support for a finding that plaintiffs are, "in actuality, seeking relief related to [E.R.'s] educational entitlements, notwithstanding their denials in unison." *Id.*

The second "clue" is less helpful. Defendants argue that the reference in the SAC to an "appeal" actually refers to a request for administrative review under the IDEA. (Doc. No. 21 at 20, quoting Doc. No. 16 ¶ 59.) Plaintiffs take issue with this assessment, noting that the SAC does not identify the anticipated "appeal" as an administrative review under the IDEA. (Doc. No. 24 at 13.) Rather, reading the SAC as a whole, they suggest that the "appeal" referred to plaintiffs' intent "to appeal [Governing Authority's] denial of their accommodation request" "under the ADA."[8] (*Id.*, quoting Doc. No. 16 ¶¶ 59, 56 (underlining omitted).) Accordingly, there remains a question of fact as to the extent to which plaintiffs have exhausted their remedies under the IDEA.

Nevertheless, the pleadings are clear that plaintiffs did start down the path of asserting rights under the IDEA by attending the IEP team meetings and requesting trained personnel to assist with Greta's handling as a related service under the IDEA. *See* 34 C.F.R. § 300.34(a) (defining "related service" as "supportive services as are required to assist a child with a disability to benefit from special education"). In fact, most of the factual allegations in the SAC are devoted to chronicling the parties' interaction throughout the informal IEP process. That plaintiffs have

---

[was], at most, tangentially related to Sophie's IEP." *Id.* at 78. In contrast here, plaintiffs do allege that defendants' denial of fully trained staff members to assist with Greta's handling deprived E.R. of a FAPE. (*See* Doc. No. 16 ¶ 132.) Further, it is evident from the pleadings that this assistance is more than tangentially related to E.R.'s education and his IEP. According to the SAC, E.R.'s access to Greta during an autistic meltdown, with the assistance of trained staff members, was critical in order for E.R. to remain in the classroom (instead of eloping) and receive instruction. (*See id.* ¶¶ 98–102.) Indeed, this was the very "accommodation" plaintiffs were seeking from E.R.'s IEP team. (*See id.* ¶¶ 46–47, 51–52.)

[8] Defendants discount plaintiffs' explanation of the word "appeal." They note that "[w]hat [p]laintiffs fail to recognize or state is that the ADA does not have any such appeal process. Parents conveyed their intent to appeal the decision of E.R.'s IEP team not to provide a one-on-one aid shortly after the May 15, 2019 IEP team meeting where the team made that decision." (Doc. No. 26 at 11, citing Doc. No. 16 ¶¶ 59, 62 and Doc. No. 19 ¶¶ 59, 62.) Again, it is neither appropriate, nor necessary to the resolution of defendants' Rule 12(c) motions, to resolve this factual dispute.

chosen to discuss these interactions devoid of mention of the IEP or the IDEA, when the documentation from these meetings is clear that plaintiffs were seeking a FAPE through the IDEA by means of E.R.'s IEP, only serves to underscore that they are attempting to evade the IDEA's exhaustion requirement through artful pleading.[9]

Other language in the SAC supports the conclusion that the gravamen of the claims is a request for relief for the denial of a FAPE," chief of which, of course, is plaintiffs' allegation that defendants' "actions have violated E.R.'s right to a Free Appropriate Public Education." (Doc. No. 16 ¶ 132.) Plaintiffs insist that, under *Fry* and its progeny, such an allegation does not necessarily require exhaustion of administrative remedies.[10] (Doc. No. 24 at 8.) Defendants, on the other hand, insist that the allegation is dispositive on the issue. (Doc. No. 21 at 14, citing *Fry, supra*). This Court need not resolve the debate because it is certainly enough to say that such an allegation distinguishes this case from the majority of the cases law relied upon by plaintiffs and lends further support for defendants' argument that the SAC seeks relief guaranteed by the IDEA.

Additionally, as evidence of the deleterious effects of defendants' refusal to adequately train its staff to assist E.R. with handling Greta, plaintiffs quote from a letter from E.R.'s teacher.

---

[9] The Court does not consider plaintiffs' efforts to obtain, by informal administrative means, a FAPE as evidence under *Fry*'s second clue involving the parties' "history of proceedings." Under *Fry*, this second inquiry was limited to a consideration of whether plaintiffs commenced the IDEA's "formal administrative procedures; it does not apply to more informal requests to IEP Team members or other school administrators for accommodations or changes to a special education program." *Fry*, 137 S. Ct. at 757 n.11. It is offered only to illustrate the extent to which plaintiffs have attempted to sanitize their pleadings to avoid their duty to exhaust.

[10] Plaintiffs cite *Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16 (1st Cir. 2019) and *Lawton Success Academy Charter Schs., Inc.*, 323 F. Supp. 3d 353 (E.D.N.Y. 2018). Both cases are easily distinguished. In *Doucette*, unlike the present case, the school did not permit the disabled student to bring his service dog to school. Moreover, the references to a FAPE in the complaint were limited to background factual references to previous findings by an IDEA due process hearing officer who heard a prior IDEA due process complaint. *Doucette*, 936 F.3d at 26 n.15. In *Lawton*, plaintiffs alleged that the school targeted the disabled student for removal based upon his disability. Given the existence of allegations that clearly evinced discrimination, the court found that the fact that the complaint also "occasionally touch[ed] on the denial of a FAPE" did not necessarily lead to the conclusion that the complaint sought relief available under the IDEA. *Lawton*, 323 F. Supp. 3d at 362.

According to the SAC, E.R. suffered an autistic meltdown in school "triggered by his teacher's decision to sanction [E.R.] with lunch detention for hitting another student with a fly swatter." (Doc. No. 16 ¶ 99.) The letter, which was reproduced in its entirety in the SAC, provides that after Mrs. Rice brought Greta to school and the two were reunited, E.R. calmed down. Specifically, the teacher reported that E.R. was "on task 100% of the time [in his reading class] and was focused." (*Id*. ¶ 102, quoting letter.) As is evident from the letter, plaintiffs' allege that the assistance of E.R.'s service animal permitted E.R. to remain in class (and avoid taking a walk or going out in the hall [*see id*. ¶ 98]) and benefit from the special education he was provided as a disabled student. *See Irving Indep. Sch. Dist*., 468 U.S. at 891 ("A service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education that Congress envisioned."); *see also* 34 C.F.R. § 300.34(a) (definition of related service).

Ultimately, the Court finds that the allegations in the SAC do not describe a failure to accommodate a disability or disability discrimination that just happens to occur in an educational setting. Rather, the gravamen of plaintiffs' claims is that defendants failed to provide E.R. with the individually tailored educational support (specifically, properly trained school personnel to assist with E.R.'s service dog, Greta) he needs to be successful in the classroom. *See, e.g., P.G. by and through R.G. v. Rutherford Cnty. Bd. of Educ*., 313 F. Supp. 3d 891, 901–05 (M.D. Tenn. 2018) (finding plaintiffs' claims relating to physical abuse disabled student received by teachers did not require exhaustion, while plaintiffs' claims alleging a failure to train teachers on handling challenging student behaviors required exhaustion under the IDEA). Plaintiffs are, therefore, required to exhaust their administrative remedies under the IDEA before bringing their claims

under the ADA and the RA.

**IV.    CONCLUSION**

For the foregoing reasons, defendants' motions (Doc. Nos. 21, 28, 29) are granted and this

case is dismissed without prejudice.

**IT IS SO ORDERED**.


Dated: August 31, 2021                                    _____

                                                   **HONORABLE SARA LIOI**
                                                   **UNITED STATES DISTRICT JUDGE**